1                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK

2

3  -------------------------------X
                       :

4  UNITED STATES OF AMERICA,   :
                       :  09-CR-00395

5                      :

6         v.           :  225 Cadman Plaza East
  KIOND JONES, *et al*.,     :  Brooklyn, New York

7                      :
             Defendants.  :  September 17, 2010

8  -------------------------------X

9

10      TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
         BEFORE THE HONORABLE FREDERIC BLOCK
         UNITED STATES SENIOR DISTRICT JUDGE

11

12  APPEARANCES:

13  For Complainant:         SETH DAVID DU CHARME, ESQ.
                        ANDREW EDWARD GOLDSMITH, ESQ.

14                        United States Attorney's Office
                        Eastern District of New York

15                        271 Cadman Plaza East
                        Brooklyn, New York 11201

16

17  For Defendant Jones:     DAVID S. SMITH, ESQ.
                        Law Offices of David Smith

18                        626 RXR Plaza
                        Uniondale, New York 11556

19

20                        RANDY SCOTT ZELIN, ESQ.
                        Randy Scott Zelin, P.C.

21                        675 Old Country Road
                        Westbury, New York 11590

22

23

24                      (Appearances continue on next page.)

25

Proceedings recorded by electronic sound recording, transcript produced by transcription service

```
 1                                                                    2

 2

 3    APPEARANCES CONTINUED:

 4    For Defendant Praddy:       MITCHELL J. DINNERSTEIN, ESQ.
                                  350 Broadway, Suite 700
 5                                New York, New York 10013

 6    For Defendant White:        MICHAEL PETER KUSHNER, ESQ.
                                  Michael P. Kushner
 7                                350 Fifth Avenue, Suite 4810
                                  New York, New York 10118
 8

 9    Court Transcriber:          KATHLEEN PRICE
                                  TypeWrite Word Processing Service
10                                211 N. Milton Road
                                  Saratoga Springs, New York 12866
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1  (Proceedings commence at 2:27 p.m.)

2        THE COURT:  Good afternoon, everybody.

3        MR. DU CHARME:  Good afternoon, Judge.

4        THE COURT OFFICER:  You all may be seated.  The

5  attorneys can come up here and have a seat at the table if you

6  like.

7     (Court and clerk confer.)

8        THE COURT OFFICER:  United States of America v.

9  Kiond Jones, Anthony Praddy and Torell White.  Where is Mr.

10 Dinnerstein?  I ask counsel if you state your appearances,

11 I'll get Mr. Dinnerstein.

12        MR. DU CHARME:  For the United States, Seth DuCharme

13 and Andrew Goldsmith.  Good afternoon, Your Honor.

14        THE COURT:  Mike, one second.  This is a great new

15 sound system but it's too loud.  So how do we adjust it?  Can

16 you do that for me?  You know, they built a very good

17 courthouse but they ran out of money when they came to put in

18 the proper auditory, if that's the right word, system.  So --

19 I hate it because -- and I'm sure you suffer the same way,

20 feedback and, you know, all those volume control, and there

21 are really sophisticated systems available but we just ran out

22 of money I guess.  So we have to all sort of like be a little

23 patient and suffer through this.  Okay?

24        Let's see whether we have the volume right.  Okay.

25 Let's hear somebody say good morning, Judge Block, even though

Status Conference                                                   4

1    it's the afternoon.

2              MR. KUSHNER:  Good morning, Judge Block.  Mr. White,

3    Michael Kushner.

4              THE COURT:  All right.  So that's great.  Can you

5    hear me okay?

6              THE CLERK:  I hear you perfectly, Your Honor.

7              MR. KUSHNER:  Yes, Your Honor.

8              THE COURT:  Okay.  You  know, first my apologies.  I

9    really feel guilty because for the last weeks I was in many

10   islands in Greece while you folks were obviously working very

11   hard and diligently on this case.  So I have to overcome that

12   guilt feeling a little bit and this is the very first time I'm

13   coming back into court since the end of July, and we'll see

14   whether I still retain any of my residual capacities to

15   function as a judge.

16             No guaranties, right?  It takes a while to get back

17   into the swing of things.  I'm sure all you folks, you know,

18   experience the same things when you go away, but I kept

19   abreast of what was happening because the technology we have

20   is just extraordinary, and I'm a great believer in using it.

21   So I got opinions out, you know, when I was in Greece

22   including, you know, finishing the Circuit Court decision for

23   the Ninth Circuit and an complex insurance claim case that I

24   tried down in Louisiana on the Katrina claim.

25             So, you know, I don't feel too guilty for being

1  away, just a little bit.  But I certainly am aware of the fact

2  that we have lots of things that have accumulated here that we

3  have to address and sort out in no particular order, and I got

4  a little bit of checklist.  I may have missed one or two.  You

5  let me know, of course, but the best way to do this is just to

6  take it one at a time, and I think the first thing that

7  strikes me is, you know, whether we're going to continue with

8  the selection of a jury on Monday which is what I'm thinking

9  of doing, quite frankly -- so she's aware of that, but I think

10 that a sentence of the White defendant is indicated here.

11 That's my gut feeling here.

12          Mr. Dinnerstein, we're going to talk about your, you

13 know, interesting motion papers, very well done but we're

14 going to do that after we decide whether we're going to have a

15 trial on Monday and we'll speak first to the issue of

16 severance now.

17          Let's see.  Mr. White's lawyer?

18          MR. KUSHNER:  That's me, Your Honor.

19          THE COURT:  Okay.  You know, whether or not this is

20 an absolute per se disqualification I think is somewhat

21 debatable but it strikes me that you have so much here that,

22 you know, I'm not at all uncomfortable -- I think that the

23 right thing to do under the facts of this case is to not have

24 White go forward here and to sever the case.

25          My sense is that the Government is somewhat

1  sensitive to that resolution as well from what I glean from

2  reading in between the lines in their papers.  I don't think

3  we need a hearing here, but you know, we'll listen to folks in

4  respect to that.

5          What does the Government say first?

6          MR. DU CHARME:  Your Honor, to the extent that a

7  severance of Mr. White would give Mr. White and Mr. Kushner

8  time to sort out whatever conflicts there may be, the

9  Government certainly doesn't oppose severance on that issue.

10         THE COURT:  I think that's the provident thing to do

11 here.  It just strikes me as that's the right thing to do.

12         MR. DU CHARME:  I mean, just to be clear, Judge, the

13 only time I think we would oppose a severance is if for some

14 reason the entire trial was adjourned in which case the

15 conflict issues could be resolved and then it would make more

16 sense to just try them all together.

17         THE COURT:  Yeah.  These conflict issues may come

18 close to the cutting edge of not being resolved, you know,

19 without getting into the fine-tuning of all of that, the Levy

20 case and these other cases that you know about.  There's been

21 a lot here.  I mean, it's not like, you know, the type of

22 stuff that sometimes we see which is sort of quasi-fabricated.

23 You know, this is legitimate stuff.  He's representing this

24 person in a civil proceeding.

25         So unless there's any, you know, objection here that

Status Conference                                        7

1    you want to speak to, I'm going to sever it.

2              MR. DU CHARME:  No objection, Your Honor.

3              THE COURT:  So, Mr. White -- now in anticipation of

4    this, the -- you're going to be relieved as counsel in the

5    criminal case.  Maybe you'll make a lot of money in the civil

6    case, I don't know.  That remains to be seen, but I spoke to

7    Mr. Hughes -- is it Michael Hughes?

8              MR. KUSHNER:  Yes, Your Honor.

9              THE COURT:  He's on our CJA list.  He's the -- you

10   know, on duty call today and I did speak to him just to make

11   sure that he was available so we don't have to any glitches

12   and we can proceed with assigning him as counsel.

13             I think that's the right way to go.  So he's been

14   assigned.  Now we'll cut an order to that effect.  And what I

15   want you to do is to just at least, Mr. Kushner, talk to him

16   without crossing the line to create any problems because of

17   your conflicts, but I leave it to you and Mr. Hughes to

18   professionally deal with each other in the appropriate order.

19   All right.

20             MR. KUSHNER:  Judge, I just -- I appreciate what you

21   just said.  I'm happy that you ordered a severance and we'll

22   work with Mr. Hughes to expeditiously get him my file and get

23   him up to speed.  I just want to -- you know, just to make the

24   record clear, I just want to say this was an unexpected

25   conflict obviously, and it was not only an unexpected conflict

1  issue because of the witness issue but also because Mr.

2  White's intention has always been to try and resolve this

3  matter along with his Judge Ross's matter and I think that the

4  assignment of counsel will help him to take that issue to its

5  resolution.

6              THE COURT:  Yeah.  And I think it's in Mr. White's

7  best interest, and he's listening carefully here and I assume

8  that he agrees with what's happening here, but Mr. White,

9  where are you?

10             DEFENDANT WHITE:  Right here.

11             THE COURT:  Let's see your hand raised.  You hear

12  what's been going on here?

13             DEFENDANT WHITE:  Yes.

14             THE COURT:  And you're agreeable to this, you have

15  no problem with this?

16             DEFENDANT WHITE:  Yes, but one thing on the record

17  because I have two cases, one with Ross and one with you.

18             THE COURT:  You have what?

19             DEFENDANT WHITE:  I have two cases, one with Ross

20  and one with you.

21             THE COURT:  Well, the important thing from your

22  perspective is you're not going to go to trial on Monday.

23             DEFENDANT WHITE:  Yes.

24             THE COURT:  Okay?  I think that you probably prefer

25  that otherwise, right?

Status Conference                                     9

1       DEFENDANT WHITE:  Yes.

2       THE COURT:  Okay.  Everything else will be sorted

3  out, you know, when you have your new attorney who will be

4  speaking to you shortly.  All right.  We're going to try to

5  work that out and have him come with you in the next few days.

6  Mr. Nelly, the court's clerk will work out the coordination of

7  when you're going to come back to court with your new

8  attorney.  He'll be in touch with you and he'll have every

9  opportunity to speak to you extensively and you'll be able to

10  talk to him and say whatever you want to him and we'll get on

11  track that way.  Okay?

12       DEFENDANT WHITE:  Uh-huh.

13       THE COURT:  Okay.  So I think that, you know, unless

14  you want to sit by and listen to the rest of the proceedings,

15  you don't have to stay here anymore.  You are retained

16  counsel.

17       MR. KUSHNER:  I was, Your Honor.

18       THE COURT:  But you're telling me from reading your

19  papers that the family pay you and that there are no funds

20  available and I can comfortably appoint CJA lawyers.

21       MR. KUSHNER:  Yes, Your Honor.

22       THE COURT:  Okay.  So far so good?  Okay.  Thank you

23  for your cooperation.

24       MR. KUSHNER:  Thank you, Your Honor.

25       THE COURT:  The case will go forward.  We're going

1   to discuss all the other issues, of course, but it's going to

2   go forward Monday with the selection of the jury by -- my

3   sense of all of this is that White is probably the least

4   involved in this whole scenario, and you know, whether there

5   will be a second trial or not, you know, maybe yes, maybe no.

6   There's always the chance there could be a plea disposition

7   especially in his case since he's not implicated in any of the

8   so-called murder scenarios.  So, you know, maybe it will be

9   that we're not going to try two cases here.

10          So we're going to forward Monday.  Now --

11          MR. SMITH:  Your Honor --

12          THE COURT:  Yeah.

13          MR. SMITH:  Sorry to interrupt you, but on that

14  issue of actually going forward on Monday, there are some

15  things I'd like to discuss with Your Honor.

16          THE COURT:  We're going to listen to it all.  Tell

17  me -- I know that you have some <u>Brady</u> material concerns or

18  other concerns.  So you can tell me about it --

19          MR. SMITH:  Well, it's not so much the <u>Brady</u>

20  material, Your Honor.

21          THE COURT:  -- you can tell me about it now.

22          MR. SMITH:  Your Honor, I just want to clear that up

23  until about two weeks ago, I had no intention whatsoever of

24  coming to the Court and asking for an adjournment.  David

25  Smith, by the way, on the behalf of Mr. Jones.

Status Conference                    11

1          Your Honor, I have been working diligently to

2     prepare this case for trial.  I've been working with my

3     client, visiting him regularly, reviewing all of the

4     Government's discovery, the 3,500 material and the rest.  It

5     was always my intention to begin trial on Monday.

6          THE COURT:  Okay.  I don't question that.  You think

7     that because they now have a fingerprint expert and the ME is

8     going to testify that you need an adjournment?

9          MR. SMITH:  Your Honor, it's not so much the ME.

10    That is not my concern.  It's the fingerprint expert, and let

11    me tell you what I learned.  Approximately two weeks ago I was

12    --

13         THE COURT:  One second, you're too loud.

14         MR. SMITH:  I'm sorry.

15         THE COURT:  Not because you're too loud but the

16    equipment is too loud.

17         MR. SMITH:  I'll back up.  Your Honor, approximately

18    two weeks ago, as Your Honor knows, we were provided notice

19    that the Government intended to offer expert testimony  --

20         THE COURT:  Let me interject one thing.  The reason

21    why we have this auditory problem is because we don't have a

22    court reporter.  We're using, you know, the services of our

23    electronic system here.  I don't like it.  I like what they

24    do, they're very good but I don't like it because of these

25    types of problems with the amplification.

Status Conference                    12

1              I assume that for the trial we'll have a court

2    reporter, Mr. Nelly?

3              THE CLERK:  Yes.

4              THE COURT:  Okay.  Go ahead.

5              MR. SMITH:  Thank you, Your Honor.

6              As I said, about two weeks ago, we were notified by

7    the Government that they intended to call these expert

8    witnesses, and the medical examiner is not my concern.  The

9    evidence relating to the fingerprints is of grave concern,

10   Your Honor, because it is the only physical evidence that

11   really ties my client into this whole thing.

12             The evidence that's involved is there was marijuana,

13   there were baggies, there was a firearm --

14             THE COURT:  Fingerprints on the bags, right?

15             MR. SMITH:  Correct.  And those bag were found in

16   the apartment in which my client resided.  However, six other

17   people resided in that apartment as well.  In fact, four of

18   them were arrested at the time.  My client was not present at

19   the time.  In fact, he was incarcerated that day and so was

20   not present at the time that they hit the search warrant.  So

21   he was never charged with that.

22             So that evidence, fingerprints on that evidence

23   relating to my client is clearly very significant --

24             THE COURT:  All right.

25             MR. SMITH:  Now, the Government indicates that they

Status Conference                    13

1  submitted this property that was recovered back in 2007 to the

2  FBI laboratory for analysis back in April.  We were not

3  provided any notice of it back then.  We had a trial date in

4  April, we had a trial date in July and we still were not

5  provided any notice of it.

6           As soon as I got the notice of this, at the

7  beginning of this motion, about two weeks before the trial, I

8  immediately wrote a letter to the Court and raised my concerns

9  about it --

10          THE COURT:  No, actually I got that.

11          MR. SMITH:  -- that I needed to get an expert.

12          THE COURT:  You were notified I think on September

13 7th that the Government wanted to have this fingerprint expert

14 testify.

15          MR. SMITH:  It may have been a little bit before

16 then, but right, on or around that date, Judge.

17          On September 10th, we were given the expert report,

18 the actual report that the expert prepared.  It's a few pages

19 long.  In the Court's directive, when I initially asked for --

20 well, at that time, it was just an adjournment of the jury

21 selection schedule for this week so we could meet today or on

22 Monday as originally scheduled to talk about this, the Court

23 said to get an expert, and that's exactly what we did.  We

24 worked diligently and I did retain an expert in Connecticut,

25 and I did forward to him the report, and this was again -- we

Status Conference                    14

1   got the report one week ago today.  Forwarded him the report

2   and forwarded to him the evidence that the Government had

3   provided which consisted of several CDs that contained

4   photographs of evidence of the fingerprints.

5              THE COURT:  So your expert has the material.

6              MR. SMITH:  Expert has the material, and I will say

7   this, that now having reviewed the material, my concerns about

8   going forward on Monday are even greater than they were even

9   before I even had an expert.  The expert had reviewed this and

10  has been very clear to us that number one, the evidence that

11  was given to him that was provided on the CDs is insufficient

12  for anybody, let alone him, to make a conclusion about the

13  fingerprints.

14             THE COURT:  Well, he can so testify.  Okay.  Go

15  ahead.

16             MR. SMITH:  Well, it goes beyond that though, Your

17  Honor, because there's potentially issues of admissibility.

18  Okay.  There's chain of custody issues.  There's several

19  issues in the case.  The point is he was not provided any

20  fingerprint comparisons to compare against.  The fingerprints

21  that were provided, you couldn't identification off of, but it

22  appears and the FBI when they tested this most likely

23  subjected these items to additional scrutiny, to enhance

24  scrutiny in order to make the fingerprint identification.

25             We have no information about that whatsoever.  We

1  have no information about the enhancements.  We have no

2  information about the tests that were prepared.  We have no

3  photographs of the enhancement.  We basically have nothing

4  that our expert can use to come up with any suggestions

5  whatsoever -- he's going to testify at trial whether he's

6  going to be used to provide cross-examination material for

7  their experts.  He can do nothing.

8          THE COURT:  Okay.  Let me ask you this.  I mean, I

9  get the drift.  What more would he need to be able to

10  effectively --

11          MR. SMITH:  In that regard, I did write a letter to

12  Mr. DuCharme as soon as I became aware of this requesting --

13  I'll give you what he indicated.  Comparison --

14          THE COURT:  I don't have that letter but make a

15  record for it now.

16          MR. SMITH:  Okay.  It's a letter that was sent on

17  September 15th to Mr. DuCharme requesting comparison-quality

18  copies of K1 which were utilized in the identification of

19  Kiond Jones, the fingerprints on the valid items, Q10 and Q20.

20  Exact copies of all digital images taken in reference to items

21  processed for latent prints to include raw files if captured

22  including but not limited to all images taken at the FBI

23  laboratory -- the history of all enhanced images to include

24  software and sequence settings utilized.  Comparison-quality

25  copies of all photographs from film negatives or other analog

1   images taken in reference to items processed for latent

2   prints.  Copies of all worksheets, bench notes and any other

3   documents pertaining to the processing and analysis of items

4   submitted, the latent print processing including the

5   identification and verification process.

6              Copies of all FBI laboratory procedures and

7   protocols pertaining to the processing and analysis of latent

8   prints evidence.  Copies of all FBI laboratory procedures and

9   protocols pertaining to the documentation of latent print

10  evidence including digital and analog photographies.  The

11  names of individuals who identified and verified the known

12  prints of Kiond Jones, K1 to the developed prints on Q10 and

13  Q20.

14             Copies and results of all proficiency and competency

15  tests taken by the persons responsible for identifying and

16  verifying the developed prints on Q10 and Q20 to the known

17  fingerprints of Kiond Jones and copies of all unsatisfactory

18  service performance assessments or disciplinary action taken

19  against the persons responsible for identifying or verifying

20  the developed prints on items Q10 and Q20 to the known prints

21  of Kiond Jones.

22             That's evidence.  Furthermore, there were questions

23  that were asked which is -- and these are critical questions

24  to any analysis:

25             Which of Mr. Jones's fingers were identified to

Status Conference                    17

1   which -- to what specific latent print?  Where was the latent

2   print located?  Who initially processed the evidence and is

3   there paperwork regarding this?  Where did the initial

4   processing occur, and what methods were used to initially

5   process the evidence?

6           Now, some of these, Your Honor, as far as the last

7   two things I understand proficiency and competency tests and

8   unsatisfactory services, things of that nature, that falls

9   into a different category than actual raw photographs,

10  evidence, comparison documents --

11          THE COURT:  There is enough in here to really have

12  to stop and pause and think about this.  All right.  I mean,

13  not everything that you have requested or he has requested

14  necessarily you're entitled to, but certainly it has a sense

15  of legitimacy to his concerns that he can't do a proper job

16  here with this rather late submission of the fingerprint

17  evidence.

18          So, Mr. DuCharme, I guess you could have done this a

19  lot earlier.  The case was set for trial way, way before I

20  took my vacation.  This is not a surprise to you.  It's

21  something that's late in coming, and it seems like the

22  defendant has really a good complaint here about not being

23  able to properly prepare for, you know, this evidence.

24          What other evidence do you have against this

25  defendant?  Is this the sole basis of your indictment?

Status Conference                    18

1    MR. DU CHARME:  Certainly not, Your Honor.  If I can

2    address first the history of those prints, just so Your Honor

3    is --

4        THE COURT:  Yeah, let's -- this is not critical to

5    your prosecution.  I mean, it can't be, you were prepared to

6    go to trial, you know, months ago.

7        MR. DU CHARME:  It's extremely probative in this

8    way, Judge.

9        THE COURT:  Yeah.  Let's assume you're right.

10       MR. DU CHARME:  Mr. --

11       THE COURT:  What do we do here in terms of the fact

12   that the expert says I just can't go ahead and function

13   properly as an expert given the paucity of information or the

14   lack of clarity or whatever it is that his concerns are.  How

15   do we address that?

16       MR. DU CHARME:  Well, I can tell you in the first

17   instance, Your Honor, that when I received a couple of days

18   ago from counsel the list of questions and requests for

19   information, I immediately forwarded that to the FBI, and

20   today, shortly frankly before appearing here, I received a fax

21   from the FBI laying out the answers to many of those questions

22   --

23       THE COURT:  So on the eve of trial this is what's

24   happening.

25       MR. DU CHARME:  Essentially and --

Status Conference                    19

1          THE COURT:  Why did it take so long?

2          MR. DU CHARME:  That's what I'd like to explain to

3    you, Judge.

4             First of all, I'd just like to say that in, you

5    know, my limited experience, Judge, you know, sometimes we get

6    prints off these things and sometimes we don't.  In an effort

7    to be completely thorough and certainly to address questions

8    that the jury might have about why we didn't look for such

9    things.  In April, we sent the items to the lab to be tested.

10   Now, coincidentally, Judge, a day or two after we sent these

11   items down Faisal Shahzad in the Times Square bombing incident

12   arose, which frankly completely consumed the New York evidence

13   response team FBI resources and the lab in Quantico to a large

14   degree because all attention and priorities were being focused

15   on that.

16          THE COURT:  I understand that, but why was it April?

17   I mean, this has been hanging out here for a long time.  I

18   understand what, you know, the priorities, you know, as a

19   result of the, you know -- the scary thing that's happened in

20   New York but, you know, how about before then?  This is not a

21   recent prosecution.

22          MR. DU CHARME:  No, it's not, Your Honor.  I frankly

23   don't have any particular explanation.  We had certain

24   priorities in the case and sending the items to see if there

25   were prints on them was perhaps not at the top of our list.

Status Conference                    20

1      THE COURT:  Okay.  All right.  So, you know, I'm

2  getting the drift of it but --

3      MR. DU CHARME:  But that said, Judge, I just want to

4  explain the importance of the fingerprints in the context of

5  the Government's evidence, and I think as counsel for Mr.

6  Jones emphasized the fingerprints are extremely important

7  evidence because in the man's -- in Kiond Jones's residence in

8  12 Raleigh Place which the evidence at trial will show was the

9  central location for the activities of the Raleigh Place crew.

10 The NYPD recovered pursuant to a search warrant these small

11 plastic bags which are consistent with marijuana distribution

12 in the vicinity of bulletproof vests, handguns, ammunition,

13 scales, other drug paraphernalia that's highly probative of

14 the fact that both Mr. Jones was present and involved --

15     THE COURT:  Granted.  I'm not going to quibble with

16 that.

17     MR. DU CHARME:  Okay.

18     THE COURT:  I assume it's probative.  It's late in

19 coming for whatever reason, part of which was due to the fact

20 that the authorities were, you know, preoccupied with the

21 alleged bombing but way before then, they were not preoccupied

22 --

23     MR. DU CHARME:  Certainly, Judge.

24     THE COURT:  -- and a good reason why this is late in

25 coming.

Status Conference                    21

1    The other thing is how to sort this out in fairness
2    to the parties.  It's probative now.  It's late in coming and
3    we're on the eve of trial and I'm not going to adjourn the
4    trial for this reason.  I have to do the fair thing under the
5    circumstances.  Okay.  And, if the expert here is a credible
6    person and seems to be a competent person and he has
7    legitimate problems in being able to, you know, go forward
8    with this expert analysis, that creates a real prejudice to
9    the defendant and how do we solve that here at this late date?
10   MR. DU CHARME:  Well, certainly, Your Honor, when
11   Jones made his initial motion for an adjournment on this
12   basis, the Government did not oppose that motion and to the
13   extent Your Honor finds that there would be prejudice, the
14   Government does not oppose an adjournment on that basis.
15   THE COURT:  But I'm not going to adjourn it because
16   I set this case a long time ago, and after this trial, I have
17   maybe a three or four, five-week trial backed up.  So my --
18   the scheduling of this thing which happened at a early time,
19   it's not coming as any surprise to the Government, I'm going
20   to keep to that.  All right?  And my sense is that, you know,
21   I'm going to allow you to use it but I think that what we can
22   do if you really want me to do this, I can have a little
23   hearing outside of the earshot of the jury and listen to the
24   expert tell me why it is he really can't effectively deal with
25   it at this late date.  I mean, that's one thing I can do but

Status Conference                    22

1  my tendency is to think that maybe I'm not going to allow you

2  to have this guy testify.

3         MR. DU CHARME:  Well, Your Honor, we'll certainly

4  continue to produce to Mr. Jones -- counsel for Mr. Jones the

5  things that he's requested that are relevant --

6         THE COURT:  I think what we're going to do this is

7  this:  We're going forward.  I'm not trying to be arbitrary, I

8  mean certainly I'm not, right, it's not that this is a last-

9  minute -- the last-minute problems comes from the Government

10 and not from me, and we'll -- you can do what you want, but

11 we're not going to have the fingerprint expert testify for a

12 while.  All right?

13        MR. DU CHARME:  Yes, Your Honor.

14        THE COURT:  You can try to satisfy the requirements

15 of the fingerprint expert.  They seem to be by and large

16 reasonable request, and if the time comes when you want to use

17 and if you still want to use the fingerprint expert, I'll then

18 decide whether I'm going to allow you to do that based upon

19 what Mr. Smith's expert tells me.  I'll have him come to court

20 perhaps and tell me whether he can go forward or not, and I'll

21 listen to him and I'll make my ruling accordingly.

22        MR. DU CHARME:  I think that's perfectly reasonable

23 from the Government's point of view, Judge.  We'll continue to

24 turn over the things, and if the expert for Mr. Jones is able

25 to go forward, then we'll go forward.  If he's not, then we'll

Status Conference                          23

1   address that.

2            THE COURT:  How does that sound?

3            MR. SMITH:  Well, Your Honor, the problem with that

4   is at a practical level while it sounds reasonable at a

5   practical level it still leaves us no time to prepare.  We

6   have a ton of other things that we need to prepare for.  We

7   still have not received any 3500 material that's --

8            THE COURT:  We're not talking about 3500 --

9            MR. SMITH:  I understand but what's going to happen

10  practically, Your Honor, is that the Government is going to

11  start giving us these things.  Tonight is Yom Kippur.  This

12  trial is starting on Monday.  They're going to start giving us

13  these things that they're going to get from the lab now or

14  they're going to give it to us on Sunday or on Monday when as

15  we're on trial, as we're picking a jury we're going to have to

16  be then funneling these things to the experts and working off

17  the heel of our shoes.

18            It's not the appropriate way -- and, ultimately,

19  okay, fine, so a week from now, they give us everything.  The

20  expert says okay, now a week later, I've already figured out

21  whether this -- this evidence can now be used, not to mention

22  the Government is going to open on Monday or Tuesday.  Are

23  they going to be permitted to open and discuss the fact that

24  there's going to be an expert witness.  Am I going --

25            THE COURT:  They're not going -- they're not going

Status Conference                    24

1    to be able to do that.

2            MR. SMITH:  And as far as voir dire questions, there

3    are voir dire questions that I might ask the Judge to consider

4    that actually have been submitted to the jury to ask about

5    expert testimony.  So there's -- to me, Your Honor --

6            THE COURT:  So, you know, I'm listening to you all

7    talk.  Why don't you submit to me that letter that you just

8    read, okay, and I'll listen to the Government's response to

9    that letter on Monday and right now, my gut feeling is that

10   eighty percent I'm not going to allow it.  All right.  But,

11   you know, I'm just processing this now so I want to be fair to

12   the Government as well as to the defendant's counsel.  Okay?

13           MR. DU CHARME:  Yes, Your Honor.

14           MR. SMITH:  Your Honor, also, one other thing, I did

15   make a motion before your vacation on our last conference we

16   discussed the issue of suppressing all of that evidence and

17   that was an issue --

18           THE COURT:  All of -- all the evidence meaning the -

19   -

20           MR. SMITH:  The evidence that was recovered pursuant

21   to that search warrant that now has been fingerprinted tested

22   and so I submitted papers on that.  We were going to have a

23   hearing.  The Court listened to arguments and took it under

24   consideration, and frankly, if that evidence is suppressed for

25   the basis -- for the reasons that I have set forth, then this

                    Status Conference                    25

1  is entirely academic and --

2             THE COURT:  This is all academic.  All right.  So

3  let's back.  What's the basis for your suppression motion?

4             MR. SMITH:  We argued this before, Your Honor --

5             THE COURT:  If you remember.

6             MR. SMITH:  Putting me on the spot that I have to

7  reargue this --

8             THE COURT:  Well, you guys put me on the spot so

9  turnaround is fair play.

10             MR. SMITH:  Fair enough.  Fair enough.  I'm just

11  trying to see if I have the motion before me.  Working off the

12  top of my head -- Your Honor, could you give me a second to

13  look at my file, Your Honor?  It's sitting back at the table -

14  -

15             THE COURT:  Can't be a good motion if you don't have

16  any recollection --

17             MR. SMITH:  No, no, I have perfect recollection but

18  there are some issues in the facts that I wanted to discuss.

19  I just want to make sure I'm correct with those.

20             THE COURT:  So we can go forward in the meantime.

21  You can just, you know, do that and we can talk to Mr.

22  Dinnerstein about his interesting motion.

23             Mr. Zelin, you have no problems here, huh?

24             MR. ZELIN:  There's really one issue for me to

25  address with Your Honor regarding another expert.  It doesn't

Status Conference                              26

1   go to the issue of an adjournment, just simply whether we want

2   to deal with it now or deal with it --

3            THE COURT:  Well, you want to say something, we're

4   here.  You know, I scheduled the whole afternoon --

5            MR. ZELIN:  Thank you, Your Honor.

6            THE COURT:  -- to sort this all out.

7            MR. ZELIN:  My appearance for the record, my name is

8   Randy Zelin, Z-e-l-i-n for defendant, Kiond Jones.  Good

9   afternoon, Your Honor.

10           Your Honor, there is the issue of what I understand

11  to be the Government's intention to establish the weight in

12  excess of 1,000 kilograms in this case based upon an

13  extrapolation theory as opposed to actually having a thousand

14  kilos of marijuana brought into the courtroom and we have a

15  concern as to the ability of an expert having the requisite

16  specialized knowledge, having something to say that's going to

17  assist the jury and really whether or not it's sufficiently

18  reliable when there's nothing to indicate in terms of the

19  number of sales over what period of time.  I'm assuming that

20  the Government may try to take the amounts of drugs that are

21  going to be ostensibly submitted into evidence which is

22  approximately two pounds and to take two pounds and morph that

23  into one ton of marijuana, and we were just concerned about

24  waiting until after the trial has gotten going and after the

25  Government has opened to address the issue of whether or not

Status Conference                    27

1  the Government should be permitted to establish weight to what

2  we believe to be such an unreliable speculative and specious -

3  -

4            THE COURT:  Sounds like a good basis for cross-

5  examination.  What do you say about this?

6            MR. DU CHARME:  Well, in the first instance, Judge,

7  we don't intend to call an expert on extrapolation.

8            THE COURT:  There you go.

9            MR. DU CHARME:  The quantities of drugs will be

10 provided with people with personal knowledge.

11           THE COURT:  Okay.  So now you have that information.

12           MR. ZELIN:  Thank you, Your Honor.

13           THE COURT:  So now you can relax, Mr. Zelin.  We

14 took care of your concerns.

15           Do you want to go forward with your telling me a

16 little bit about your suppression motion?

17           MR. SMITH:  Yes, Your Honor.  We argued in our

18 motion that the warrant itself that was issued by a state

19 judge at the time authorizing the search was actually an

20 invalid warrant and that there were issues of reliability with

21 the informant.  There were facts that were uncovered that we

22 were provided with afterwards that demonstrated that the

23 informant was actually not reliable, and a transcript was

24 provided to us of the informant's testimony before the issuing

25 judge, but that was provided to us in redacted form, and the

Status Conference                    28

1  Court had asked the Government to provide an unredacted copy

2  to the Court because critical things were redacted in that,

3  like dates, times --

4          THE COURT:  Right.  I remember that, yeah.

5          MR. SMITH:  Okay.  And it was difficult for us

6  without having seen the unredacted warrant to say specifically

7  what the issues were but there are your general issues of

8  things like staleness, of when was it that this informant was

9  in the location to observe the things that he said that he

10 saw, and if it was after a specific period of time, then it

11 would be too old.  There has to be -- there has to be some

12 freshness to the information.

13         There was also nothing whatsoever discussed that we

14 can see before the judge who issued this about the informant's

15 prior track record, whether this informant had ever --

16         THE COURT:  Basically -- you're basically saying

17 that the informant was unreliable.

18         MR. SMITH:  Well, the informant -- correct.  The

19 informant was unreliable --

20         THE COURT:  The basis for the search warrant, does

21 it all depend upon the informant, Mr. DuCharme?  I haven't

22 looked at it.  I will have to catch --

23         MR. DU CHARME:  Your Honor, just a couple of things.

24 The information that was redacted from the transcript was

25 redacted at the request -- because the times and dates and

1  some of the things that Mr. Smith has identified they felt

2  would have revealed the identity of this person.  That's why

3  we produced an unredacted version to chambers for inspection.

4          That said, Judge, the issue is simply this.  The

5  state court judge met with the informant face to face, asked

6  the informant a number of questions, asked the police officer

7  who was present a number of questions and made a determination

8  that she found that the informant was reliable.

9          In addition, Judge, the warrant was executed in good

10  faith by the police officers who had it.  So, even to the

11  extent that --

12          THE COURT:  So you have a Leon situation.

13          MR. DU CHARME:  Yes, Your Honor.  So in our view

14  there's -- first of all, there was nothing wrong with the

15  application in the granting of the warrant but even if there

16  was, the officers executed it in good faith and it's not a

17  basis for suppression.

18          THE COURT:  Okay.  So here's what we're going to do.

19  I have homework to do on this whole issue that really stems

20  from the fingerprint -- latent fingerprint analysis and

21  report. So I'll take a look.  Let me have your paper that you

22  submitted.  I'll take a look at the search warrant, and we're

23  not going to open up on the issue of fingerprint expert.  I'll

24  instruct Judge Azrack in whatever questions she asks, don't

25  mention fingerprint experts.  She can talk about experts in

Status Conference                    30

1  general without focusing on fingerprints.  It's not going to

2  prejudice anybody.

3           And, as I sit here, the likelihood is I'm not going

4  to let the Government go forward with this evidence but, you

5  know, I'm going to give you a final determination the

6  beginning of next week after I have proper reflection upon it.

7  Okay?

8           MR. DU CHARME:  Just so I'm clear, Your Honor,

9  you're thinking that you're probably not going to go forward

10  with the fingerprint evidence, you're going to give further

11  consideration to the suppression motions that were --

12           THE COURT:  Well, the suppression motion, you know,

13  becomes academic if we're not going to allow the fingerprint

14  expert to testify, doesn't it?

15           MR. DU CHARME:  No, Your Honor.

16           MR. SMITH:  It's actually the reverse, Your Honor.

17           MR. DU CHARME:  It's the reverse, that's right.

18  Recovered from the search was a handgun, ammunition,

19  magazines, scales, marijuana, cash, bulletproof vests --

20           THE COURT:  Okay.  That would still be relevant.

21           MR. DU CHARME:  It's extremely relevant.

22           THE COURT:  Okay.

23           MR. SMITH:  If the Court suppresses based upon our

24  motion that evidence, then any fingerprint analysis --

25           THE COURT:  Right.

1          MR. SMITH:  -- of it is rendered moot.

2          THE COURT:  Right.  Right.

3          MR. DU CHARME:  Certainly even without the

4    fingerprints --

5          THE COURT:  If I don't suppress it, it comes into

6    evidence and then -- fingerprint expert to, you know, testify.

7    So that's a viable possibility.

8          MR. DU CHARME:  Yes, Your Honor.

9          MR. SMITH:  Understood, Your Honor.

10          THE COURT:  It will probably work out that way.

11   That's my guess.  Okay?  And we'll let you know for sure on

12   Monday or Tuesday.  My policy over sixteen years is not to

13   make final decisions my first day back from vacation.  Except

14   when Mr. Zelin is involved.

15          (Unrelated Court matter discussed.)

16          THE COURT:  Okay.  So, Mr. Dinnerstein, we saved you

17   for last because you're the tallest and the best looking.

18          (Unrelated Court matter discussed.)

19          THE COURT:  So, you know, I did the read the Hoo

20   case, H-o-o, and it seems that you got the big hurdle to

21   overcome here in light of Judge Winter's decision back in

22   1987. I know you've tried to do it, but you know, I guess, you

23   know, conceptually, there might be a situation when you can

24   show that the Government acted in bad faith or, you know, for

25   a tactical advantage and that there's extreme prejudice.  I

1   think that conceptually there may be a window of opportunity

2   and the proper case for that to go forward and maybe flush it

3   out at a hearing.  Judge Sweet held a hearing in this case but

4   I don't see where there's any real substance to any bad faith

5   or strategic advantage situation here in light of the fact

6   that the Government has represented that this new witness came

7   to them fairly recently.

8          One thought I had is that I'm going to hear that

9   testimony and if I find out that the Government during the

10  course of the trial knew about this person well in advance and

11  it wasn't somebody who they just recently learned about, I

12  might toss it, I mean, but you know, I'll be able to hear all

13  the relevant facts that you can develop, you know, in the

14  course of the trial that would, you know, relate to this

15  concept of acting in bad faith or prejudice.  I mean, what do

16  you think about that?

17         MR. DINNERSTEIN:  Well, it's an interesting thought,

18  Your Honor, but I think it's somewhat more complex than that

19  in terms of what the particular issue is in this case because

20  -- and let me just kind of talk about what I -- how I see it.

21  This murder occurred on May 26th of 2004 when Anthony, my

22  client was sixteen years old, and there's no question about

23  that.  And there also was a telephone call on May 29th of 2004

24  which was an anonymous call which named two people as being

25  possibly the perpetrators of the crime.

Status Conference                    33

1    THE COURT:  I remember that, right.  Yeah, and then

2  I read the underlying, you know, state records and they didn't

3  go forward and for good reason.  It was an anonymous call,

4  there wasn't reliable evidence at that time that they really -

5  - in the exercise of their sound discretion were comfortable

6  in going forward with.  I think that sounds reasonable.

7    MR. DINNERSTEIN:  I agree as far as it goes, Your

8  Honor, but the question really is, in 2004 when the state got

9  this information, and this was homicide number thirteen.  It

10  isn't like there were so many homicides that they couldn't

11  conduct an investigation and a proper investigation.

12    And I mean, I don't know what was the nature of the

13  investigation that the State did.  I think it's implausible to

14  suggest that the State did nothing.  Either -- and there's

15  really only one of two options.  One, they checked out this

16  telephone call and they made a determination based upon

17  talking to whomever they talked to that it wasn't reliable

18  information.  If that's the case, then --

19    THE COURT:  You think that's Brady material.

20    MR. DINNERSTEIN:  Well, of course it's Brady

21  material if that's the case.

22    THE COURT:  And it would be exculpatory, Mr.

23  DuCharme, wouldn't it?

24    MR. DU CHARME:  Your Honor, the Government is not

25  aware of any such --

Status Conference                         34

1          THE COURT:  Well, you're making a representation

2    that you know of nothing of that sort.  So you have a record

3    here and if it turns out not to be correct, you're going to

4    have your remedies.

5          MR. DINNERSTEIN:  Well, I understand that, Your

6    Honor, but the Government would also have to say I would

7    suggest under these circumstances that the State with that

8    information conducted no investigation, and that's really a

9    pretty trick point for this Court to accept that no

10   investigation was done after May 29th when the Government

11   actually received information that these two individuals

12   committed a crime and that they did, you know, nothing that

13   would have either determined that Mr. Praddy was the right

14   person or that he was not the right person.  It has to be

15   either one or the other.

16          If he was the right person, if they had information

17   that would suggest that he was the right person but the

18   Government didn't feel that it was -- that there was enough

19   material there to go forward and to bring the case, then we're

20   in somewhat of a different situation, but even under those

21   circumstances, when the Government says in 2007 apparently an

22   informant came forward and said he witnessed the incident, the

23   Government was in -- I would suggest an odd position because

24   it would have been logical for the Government to look at what

25   the State investigation was from 2004 to the present.

Status Conference                               35

1          To suggest that they didn't do that I think is

2    highly implausible.

3          THE COURT:  Why don't you use this as part of your

4    defense and call these people as witnesses and establish --

5          MR. DINNERSTEIN:  But I don't know --

6          THE COURT:  -- the fact that they got an anonymous

7    call, they didn't conduct any investigation.  Maybe I'll give

8    you some latitude to do that.

9          MR. DINNERSTEIN:  Well, Your Honor, I don't -- I

10   don't believe that that's what happened.  I believe there was

11   some sort of investigation.

12         THE COURT:  No, no.  I -- listen, what I'm saying is

13   that, you know, you have the records.  You can question these

14   people and you can make this one of your, you know, issues of

15   defense and you have a case that's definitely triable before

16   the jury.  It's an interesting case in many ways but it sounds

17   to me at least the first instance totally a defensible case.

18   You know, ID testimony, you know, suspect and everything else,

19   right, and -- but you can really build on that by showing that

20   they had information and they didn't conduct an investigation.

21   They should have known who this was then, they didn't come

22   forward.  I'll give you the opportunity if you want to develop

23   that as part of your defense to do so.

24         MR. DINNERSTEIN:  I would -- I probably will do it

25   irrespective of whether I receive the DD5 reports from 2004 --

Status Conference                    36

1          THE COURT:  Right.

2          MR. DINNERSTEIN:  The Government says that they

3    don't have to turn over that material to me.

4          THE COURT:  Well --

5          MR. DINNERSTEIN:  I think that's wrong.

6          THE COURT:  -- no, they're not saying that.  They're

7    saying there's no <u>Brady</u> material, and you know, you can

8    subpoena the records from the state authorities.  I'll let you

9    do that.  I don't know whether you've done that yet or not.

10   Have you done that?

11         MR. DINNERSTEIN:  No, Judge, and the reality is I

12   won't have them.  I mean, I won't get material like that

13   through the district attorney's office.

14         THE COURT:  I don't know, but you can issue a

15   subpoena, you can have people come and testify.  You can

16   cross-examine them.  I'll give you latitude.

17         MR. DINNERSTEIN:  But when you say, Your Honor,

18   people, I don't know the people.  I don't know which people it

19   is who filled out the report.  I don't know --

20         THE COURT:  Well, you have the report with their

21   names on it.

22         MR. DINNERSTEIN:  No, I have one report with one

23   name.

24         THE COURT:  Well, that's what you have.

25         MR. DINNERSTEIN:  And that's Detective Column.

Status Conference                    37

1    THE COURT:  Yeah.  Is he still alive, is he
2    available to be called as a witness?
3    MR. GOLDSTEIN:  I don't know Detective Column, Your
4    Honor.  Just to back up though, Mr. Dinnerstein wants to know
5    what the NYPD did, and whether the NYPD investigated this case
6    in 2004 and of course they did, and in fact, we've already
7    turned over some records of that including the ones that he's
8    talking about.
9    THE COURT:  He turned over the records, right.
10   MR. GOLDSTEIN:  The ones that we determined were
11   arguably Brady material.  We're not aware of any other -- any
12   other Brady material and I should say also we've actually
13   given Mr. Dinnerstein two names, two potential witness names
14   that he can look into as far as that's concerned.  But, more
15   importantly, Your Honor, what the NYPD did in 2004 is not at
16   all relevant to this motion.  The question is what the Federal
17   Government did.
18   THE COURT:  I'm not so sure about that.  I mean,
19   there's law that ties in tandem, the State and the Federal
20   authorities under proper circumstances.
21   MR. GOLDSTEIN:  Well, to the extent that's true,
22   Your Honor, we've already had a hearing by which the Court and
23   Mr. Dinnerstein questioned the case age --
24   THE COURT:  That's true.
25   MR. GOLDSTEIN:  -- about how this case came to be.

Status Conference                    38

1              THE COURT:  That's right.  I remember that.

2              MR. GOLDSTEIN:  And what he said quite clearly and

3     what Mr. DuCharme said quite clearly was that the Government

4     chose to bring this case after we obtained this witness in

5     2010.  There -- Mr. Dinnerstein pointed out some

6     inconsistencies or ambiguities in other portions of the

7     testimony --

8              THE COURT:  Right.

9              MR. GOLDSTEIN:  -- but the decisive factor is the

10    2010 witness.

11             THE COURT:  Oh, I understand that, and you did have

12    the opportunity to question the officer.  I made him testify,

13    we remember all of that now, but you can develop this.  The

14    Government is making representations that it has no records.

15    It's not that they're not turning over records to you.  They

16    do not have any information or am I wrong about that?

17             MR. GOLDSTEIN:  Your Honor, the --

18             THE COURT:  What else do you have?

19             MR. GOLDSTEIN:  We have the NYPD's file concerning

20    Mr. -- we have turned over to defense counsel everything in it

21    that is discoverable.  There are certainly parts of that file

22    that are not discoverable.

23             THE COURT:  Like what?

24             MR. GOLDSTEIN:  Well, for example, Your Honor, if

25    there are negative results from a canvas, if you go up to

1   someone and say do you know anything about the murder and they

2   say no, in the Government's view, that's not <u>Brady</u> material.

3        THE COURT:  You probably are right but I mean, in

4   fairness, you know, what's wrong with giving him that

5   information?  What do you lose, what do you fear by doing

6   that? I mean, in terms of what would come out at the trial,

7   what's evidentiary or what can be questioned and what

8   witnesses can be called, we can deal with that during the

9   course of the trial but what's wrong with letting him know

10  that?

11       MR. GOLDSTEIN:  Your Honor, there's nothing that we

12  fear --

13       THE COURT:  I  just don't understand what you have

14  to be concerned about.  What else do you have that you're

15  concerned about that you haven't turned over to him?

16       MR. GOLDSTEIN:  As I say, Judge, there's nothing

17  that we're concerned about.  What we have is a thick file and

18  we have produced the pieces of it that the Federal Rules and

19  the law requires.  That's what we've done.

20       THE COURT:  You see, the problem with <u>Brady</u> material

21  is that, you know, the Government, you know, makes

22  representation, the Government turns over some material, and

23  then later on, there are other proceedings, things crop up.

24  You have to take a look at what the Government didn't turn

25  over.  Need I tell you that there have been problems in that

 1  respect in certain cases?

 2          MR. GOLDSTEIN:  And, Your Honor, with that in mind,

 3  we have turned over more than we initially --

 4          THE COURT:  You may -- how do I know?  You're

 5  telling me this.  Maybe you have, but what I'm trying to do is

 6  be practical about it.  Is there anything in the trial that's

 7  a problem why they can't have it?  Is it a big file, little

 8  file?

 9          MR. GOLDSTEIN:  It's fairly big, Your Honor.  It was

10  a murder as Mr. Dinnerstein said.

11          THE COURT:  Yeah.  Well, why don't you just turn

12  over the file to him.  Okay.

13          MR. DINNERSTEIN:  Your Honor, may I just say one --

14          THE COURT:  You're not going to get an adjournment

15  but you'll have the file.

16          MR. DINNERSTEIN:  They provided me with two names,

17  one name being Anthony James and the other being I think

18  Natasha Merchason (sic).  These were people who either -- who

19  were talked to in 2004 shortly after the murder.  One of them

20  gave a description of the perpetrators that did not -- the

21  point is those two people seven years after the fact are not

22  people that I can find.  My investigator has made an effort to

23  find those people and he's been unable to find those people.

24          So the fact that I got information six years after

25  the fact, seven years after the fact doesn't necessarily help

Status Conference                    41

1   me find these people.  I mean, because that's what happens in

2   life.  People move, people do --

3            THE COURT:  Well, I understand that, you know, this

4   is an indictment that spans a decade in terms of this global

5   conspiracy and the Government is trying to sweep everything

6   within that decade or twelve-year period of time that's

7   somewhat problematic for me, but be that as it may, I mean

8   this could be prejudicial.  If you knew about this three, four

9   years ago, you might find those people and you can't find them

10  now for trial.  Okay.  What does the Government say about it?

11           MR. GOLDSTEIN:  Your Honor, the Government has given

12  Mr. Dinnerstein a phone number for Ms. I believe it's

13  Marchand.  As far as Mr. James is concerned, the Government

14  has no contact information for him.  If we did, we would give

15  it to Mr. Dinnerstein.

16           MR. DINNERSTEIN:  The telephone number that we have,

17  we've -- has not provided -- has not provided any fruitful

18  information to us.  So whether that's a correct telephone

19  number or not, we don't know but we certainly made phone calls

20  to that --

21           THE COURT:  See, my concern is that because of the

22  unique nature of this case and the long passage of time, there

23  could be some practical prejudice to the parties here.  How to

24  deal with it, why don't you just explore it during the course

25  of the trial and use it to your advantage.  It's an old case.

Status Conference                              42

1    I'm instructing the Government to turn over the file to you.

2    They probably technically don't have to do that.  I don't

3    think they made any error in their representations to the

4    Court, but I think in fairness considering the fact that this

5    goes back so many years that it strikes me that the fair thing

6    to do would be to give you access to the file, and that may

7    overcome the possible prejudice that you may have suffered

8    because you can't find these names now after the passage of

9    all these years.

10            So I think that balancing all that out, you're going

11    to get the whole file and see how it goes after that.  Okay?

12    All right.

13            Anything else now?  As far as the Hoo case is

14    concerned, I don't see how you can get around it quite

15    frankly.  You have your arguments.  They're preserved.  You

16    know, we'll see what happens during the course of the hearing

17    as to whether the Government has not been candid with the

18    Court that this critical person came about recently that they

19    didn't, you know, drag their heels and try to obtain a

20    tactical advantage and, you know, prejudice you because of

21    that.  It doesn't sound as if they've done that to me from

22    what I see, but if I find out during the course of the trial

23    that there's problems, we'll deal with it at that time.

24            MR. DINNERSTEIN:  I just find it an odd idea, Your

25    Honor, that the Government would not have been able to pursue

Status Conference                    43

1  this case in 2007 but would have in 2010, and for them to

2  simply argue well, we didn't feel we had enough --

3          THE COURT:  It seems to me, Mr. Dinnerstein, that

4  that's a fertile area for cross-examination and to, you know,

5  sort of blouse that a theory -- your theories of defense, and

6  we're going to save that for the trial.  I can't dismiss the

7  case based upon the argument here, you know, which is factual

8  here now.

9          MR. DINNERSTEIN:  I'm actually not asking you to

10  dismiss the case.  I'm asking you -- and this is where there's

11  a difference --

12          THE COURT:  What are you asking me to do?

13          MR. DINNERSTEIN:  -- from our case.

14          Hoo was a racketeering and conspiracy indictment

15  that was not based on my reading of the case any substantive

16  count for an act that occurred prior to the defendant's

17  eighteenth birthday.  In this case, in the fact, the most

18  serious substantive count, the murder count was for an act

19  that was committed clearly my client's eighteenth birthday --

20          THE COURT:  I understand that and you can preserve

21  the issue for the Supreme Court but the Second Circuit has

22  said lights out on that argument.  I mean, I have to follow

23  the law that's --

24          MR. DINNERSTEIN:  No I understand, Judge.  I'm not

25  sure that's what -- I think the Second Circuit does not

1    address the issue of substantive comments and has addressed

2    the issue of racketeering --

3              THE COURT:  My thinking is that it all comes under

4    the same umbrella here, but that's the rulings I've made here.

5              MR. GOLDSTEIN:  Your Honor, let me just clarify one

6    point.  The -- at the previous -- when we discussed this

7    matter previously at the status conference in the hearing

8    where the agent testified, we said that the Government first

9    became aware of the eyewitness to the murder in 2007.  The FBI

10   and the U.S. Attorney's Office for the Eastern District became

11   aware of that witness in 2007.

12             In 2006, the Southern District and Immigration and

13   Customs Enforcement became aware of that -- we don't think it

14   changes the analysis but we just didn't want to leave a

15   misimpression --

16             THE COURT:  How old was he at that time when he

17   first became aware of the --

18             MR. GOLDSTEIN:  The one witness?

19             THE COURT:  -- this important witness?

20             MR. GOLDSTEIN:  It was August '06 I think when

21   Southern first heard about it, Judge.

22             THE COURT:  How old was he?

23             MR. DINNERSTEIN:  So he was -- he born on September

24   11th, 1987.  So he would have been eighteen or nineteen at

25   that time.  In 2006, he would have been -- he would have been

Status Conference                    45

1   --

2        THE COURT:  So then the issue is that, you know, you

3   had three years during which you could have brought this

4   proceeding once you found this important witness and why

5   didn't you do it?  I mean, the record should be clearly

6   factually so that the Circuit Courts can grapple with it.

7        MR. GOLDSTEIN:  Right.  So that's why we wanted to

8   put that on the record about the Southern District and

9   Immigration, but as far as when we could have gone forward, I

10  think the most telling fact is that we indicted Mr. Praddy in

11  2009 when he was twenty-one years old on the original

12  indictment in this case.  We didn't bring the murder charge.

13  We only brought the murder charge when we got this additional

14  witness in 2007 when Mr. Praddy was twenty-two.  So the idea

15  that we somehow were waiting in the --

16       THE COURT:  All right.  So let's get the facts and

17  sequence down clear so we have a clear record.  2006 you

18  learned specifically what?

19       MR. GOLDSTEIN:  In 2006, Immigration and Customs

20  Enforcement and the Southern District of New York U.S.

21  Attorney's Office became aware of a witness who was an

22  eyewitness to the murder.  That witness was passed on to the

23  Eastern District and the FBI in 2007.

24       THE COURT:  In 2007, you knew about this eyewitness.

25       MR. GOLDSTEIN:  Correct, Your Honor.

Status Conference                46

1          THE COURT:  All right.  So the next question is what

2   did you find out thereafter that was the so-called

3   precipitating event to bring this rather serious charge

4   against this young man after he became twenty-one?  Factually,

5   what did you learn in 2010?

6          MR. GOLDSTEIN:  2010, we got an additional witness,

7   Your Honor, who as we discussed at the last status conference

8   was present for admissions --

9          THE COURT:  So, in 2010, you learned about this

10  person who is going to presumably testify that the defendant

11  made these telltale admissions to --

12         MR. GOLDSTEIN:  Yes,  Your Honor.

13         THE COURT:  Okay.  And, in 2007, you did not have

14  that, you had an ID.  So now you have the combination of the

15  ID plus the confession.  All right.  See, I think that's good

16  faith because, you know, ID is a very, very fragile type of

17  situation.  The law is very clear about that.  It's one of the

18  more frequently reversed, you know, scenarios when you're

19  dealing with IDs and there's a lot written about that.  So I

20  can understand why maybe the Government did not, you know,

21  feel comfortable in going forward with just that ID back then,

22  but after you got this person who now has presumably told you

23  that the defendant 'fessed (sic) up to him, that sounds to me

24  that you had a basis to indict him after he was twenty-one

25  years of age.

Status Conference                    47

1          And, at that time in 2010, he had reached his
2    twenty-first birthday already --
3          MR. GOLDSTEIN:  He in fact was twenty-two, Your
4    Honor.
5          THE COURT:  Twenty-two.  All right.  So we have a
6    clear record.  I'm ruling for the Government here, but I think
7    that it's important that we have a clear record.
8          MR. DINNERSTEIN:  Your Honor, may I just clarify the
9    record a little bit in terms of this particular issue?
10         THE COURT:  Go ahead.
11         MR. DINNERSTEIN:  Although the witness, apparently
12   the first witness they use the term an "ID witness," it is my
13   understanding and this is only my understanding as of quite
14   recent because we really don't know exactly who that
15   individual is, but it's my understanding now is that person
16   has known the defendant for a long time.  So it isn't an ID
17   witness in the traditional sense of --
18         THE COURT:  I understand that, but Mr. Dinnerstein,
19   this is all going to come out during the course of the trial.
20   So we'll have an absolute record here, and you know, we're
21   going to go forward and we'll see how it all plays out.
22         MR. DINNERSTEIN:  But as you can understand I hope
23   this is a trial where my client's life is on --
24         THE COURT:  Well, that's why I'm spending all the
25   time I'm spending.  I'm taking it quite seriously obviously,

Status Conference                    48

1   right?  So I think what we've accomplished today, Mr.
2   Dinnerstein, through your skillful advocacy is that you're
3   going to get the whole file.  Okay.  And the Government
4   probably is not happy with that ruling but they're going to be
5   able to go forward with the prosecution.  We're going to start
6   this trial with jury selection on Monday and I'll let you know
7   after I think a little bit more about it what my final
8   determination will be on that pending suppression motion.  I
9   want to just look at the papers.  Quite frankly, I haven't
10  done that.
11          MR. DINNERSTEIN:  Can I just bring one other point,
12  Your Honor, regarding this?  I'm sorry.
13          THE COURT:  Yeah.
14          MR. DINNERSTEIN:  The 2010 witness that the
15  Government talked about is claiming that six years before Mr.
16  Praddy confessed to him.  It wasn't like he confessed that
17  week --
18          THE COURT:  You've got great cross-examination --
19          MR. DINNERSTEIN:  I understand that, Judge.  I just
20  wanted the record to be clear as to what --
21          THE COURT:  Okay.  You made -- you made -- look,
22  certainly, you tried very hard for your client, and -- but I'm
23  not going to preclude you from going into all of this, you
24  know, during the questioning of these -- sure.  And what will
25  come out of the pipeline remains to be seen but we're going to

Status Conference                          49

1  go forward.

2          Anything else we need to attend to today?  We have

3  all these 404(b) situations, right?

4          MR. GOLDSTEIN:  Yes, Judge.  Well, in our view,

5  they're not 404(b) --

6          THE COURT:  Well, you have these -- right.  You're

7  saying it's direct evidence.

8          MR. GOLDSTEIN:  Yes, Your Honor.

9          THE COURT:  I don't -- you know, I read it over.

10  You know, I have a sense that you're generally probably

11  correct, but I am troubled by the fact that you have this

12  what, twelve-year period and almost everything that happened

13  during this twelve-year period you're claiming is direct

14  evidence of the enterprise or the conspiracy.  That troubles

15  me a little bit.

16          MR. GOLDSTEIN:  Actually, that's -- I don't think

17  that's accurate, Your Honor.  There are a number of bad acts

18  by I believe all of the defendants that we are not planning to

19  prove at trial because they are not sufficiently related or --

20  and so on and so forth.

21          THE COURT:  There has to be some nexus here.

22          MR. GOLDSTEIN:  Yes, Your Honor.  And the facts --

23  the events that we talked about in the letter notify the Court

24  and counsel about specifically with respect to Mr. Jones there

25  were occasions on which he possessed a firearm and one

Status Conference                    50

1   occasion in which he pled guilty to having possessed --

2            THE COURT:  Right.  Why would that be something that

3   happened in the course of this long twelve-year conspiracy.  I

4   mean, so you're saying anytime during this twelve-year period

5   Mr. Jones was found to possess a firearm, it definitely, you

6   know, is part and parcel of the evidentiary aspects of this

7   trial.

8            MR. GOLDSTEIN:  Well, Your Honor, there are a couple

9   of different charges that it's relevant to.  One is the direct

10  hearing charge, another is the 924(c) charge where one element

11  of the 924(c) charge is possessing the gun.  Certainly --

12           THE COURT:  He pled guilty to that.

13           MR. GOLDSTEIN:  He did, Your Honor, and certainly,

14  mere possession does not prove the entire charge --

15           THE COURT:  Right.

16           MR. GOLDSTEIN:  -- but we will put on other evidence

17  --

18           THE COURT:  You're going to tie it together.

19           MR. GOLDSTEIN:  Yes, Your Honor.

20           THE COURT:  All right.  I'll take it on faith now.

21  Okay.

22           MR. GOLDSTEIN:  Thank you,  Your Honor.

23           THE COURT:  Anything else today?  We've done a lot.

24           MR. GOLDSTEIN:  I'm sorry, if I could just clarify

25  on that issue.  The evidence that we intend to put in so that

1   no one is surprised is the allocution of Mr. Jones as well as

2   testimony concerning the underlying event to which he pled

3   guilty.

4           THE COURT:  Yeah.  If I have some concerns about it,

5   I can hear it outside of the earshot of the jury.

6           MR. GOLDSTEIN:  Certainly.

7           THE COURT:  And I may just do that in one or two of

8   these situations.

9           MR. GOLDSTEIN:  Yes, Your Honor.

10          THE COURT:  Anything else?

11          MR. DINNERSTEIN:  Well, Your Honor, surely the

12  Government plans on doing the same thing as it applies to Mr.

13  Praddy.  He was arrested possession of a weapon along with I

14  believe it was seven-eighths of an ounce of marijuana and it's

15  my understanding that the Government -- and there's no

16  conviction in that case.  There's a youthful offender

17  adjudication but it appears that the Government's intent is to

18  bring up that matter for purposes of saying that this was in

19  furtherance of a conspiracy.  This was act --

20          THE COURT:  Well, they know what their burden is.  I

21  mean, they need more than just a naked, you know, testimony

22  that somebody was in possession of a weapon.  It has to have

23  some relevancy or some content to, you know, the underlying

24  criminal acts that were involved.

25          I'll see you folks probably Wednesday morning.

```
                    Status Conference                        52
```

1  Well, maybe we should set this down for a little bit of a

2  continued conference for Tuesday afternoon, let's say, 3:30 so

3  we can deal with anything that may come out of the pipeline in

4  the meantime.

5         Give me some sort of a head's up of how long you

6  expect this trial to last, Mr. DuCharme.

7         MR. DU CHARME:  We'll be certainly into next week,

8  Your Honor.  I think we'll probably --

9         THE COURT:  No, I'm not rushing anybody.  I mean, I

10  just want to get a practical sense of things.

11         MR. DU CHARME:  Yeah, I think about a week and a

12  half.  Are you sitting on Fridays, Your Honor?

13         THE COURT:  We have a lot of sentences on Friday,

14  but you know, I usually don't take testimony on Friday but,

15  you know, that's a general rule, and I really make my

16  decisions once I get into the case, but we're starting on

17  Wednesday.  Maybe I'll take --

18      (Court and clerk confer.)

19         MR. DINNERSTEIN:  My concern, Your Honor, is that I

20  have a matter in Queens that I was hoping to schedule for

21  Friday but if I can't I'll inform them that that's --

22         THE COURT:  We could go Wednesday and Thursday, then

23  all of the following week.  Okay?  All right.

24         Okay.  Tuesday, 3:30.  Thanks for your cooperation.

25         MR. DU CHARME:  Thank you, Your Honor.

```
                    Status Conference                    53
1            MR. DINNERSTEIN:  Thank you, Your Honor.
2            MR. KUSHNER:  And, Judge, just one more point with
3    respect to Mr. White, he's always asked me to indicate that it
4    was a hopefully concurrent sentence.
5            THE COURT:  Okay.  Thank you.
6            MR. KUSHNER:  Thank you for your time.
7                    (Concluded at 3:46 p.m.)
8                        *  *  *  *  *  *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

54

1        I certify that the foregoing is a court transcript from

2    an electronic sound recording of the proceedings in the above-

3    entitled matter.

4

5

6    _____

7                            Kathleen Price

8    Dated:   September 20, 2010