UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
UNITED STATES OF AMERICA

  -against-

KIOND JONES, also known as "Kiond
Hing," and "Kion," ANTHONY PRADDY,
also known as "Birdman", and TORRELL
WHYTE, also known as "Terror",

                Defendants.
---------------------------------------------------------x

**MEMORANDUM**
Case No. 09-CR-395 (S-1)

**BLOCK, Senior District Judge:**

Anthony Praddy is serving a sentence of 15 years' imprisonment pursuant to the Court's judgment of November 9, 2011. The Bureau of Prisons ("BOP") has classified Praddy's security level as "high," and has designated him to USP Big Sandy, a high-security facility in eastern Kentucky. His classification was based on an outdated Presentence Report ("PSR") containing allegations rejected by the jury at trial and by the Court at sentencing.

As explained below, the Court's post-sentencing role is closely circumscribed. It nevertheless writes to bring the issue to the attention of the Bureau of Prisons ("BOP"), in the hope — and firm belief — that that agency will see to it that the mistake is corrected.

## BACKGROUND

On October 14, 2010, a jury found Praddy guilty of racketeering and racketeering conspiracy, conspiracy to distribute 100 kilograms or more of marijuana, use of a firearm in furtherance of the distribution conspiracy, and four instances of small-scale

marijuana distribution. It was unable to reach a verdict on charges relating to the murder of Kevin Simon. A second jury found Praddy not guilty of those charges – namely, murder in aid of racketeering and use of a firearm to commit the murder – on May 2, 2011.

Prior to sentencing, the Probation Department prepared a PSR. Over defense counsel's objection, the PSR included facts related to the Simon murder as relevant conduct. At sentencing, however, the Court concluded that the government had not established Praddy's involvement in the murder by clear and convincing evidence and, accordingly, declined to consider it in imposing sentence, which, as noted, included a term of imprisonment of 15 years. The Court's Statement of Reasons also made clear that "the Court did not consider the murder of Kevin Simon when calculating the base offense level due to a lack of clear and convincing evidence." In addition, the Court directed the Probation Department to prepare a revised PSR omitting references to the murder.

In the meantime, BOP prepared an "Inmate Load and Security Designation Form" for Praddy. BOP uses the form – known as a BP-337 – to classify an inmate's security level. That classification then becomes a key factor in designating an inmate to a particular facility. Significantly, Praddy's BP-337 was prepared on November 15, 2011, a month before the revised PSR was completed on December 19, 2011.

Security classification is based on a number of factors, including the inmate's age, education level and history, if any, of drug or alcohol abuse. The factors are converted into points, which are added together to arrive at a "Total Security Score." *See* BOP Program Statement P5100.08, ch. 4 (Sept. 12, 2006), *available at* http://www.bop.gov/policy/progstat/5100_008.pdf (last visited June 22, 2012).

One factor is particularly pertinent here: "Severity of current offense" measures "the most severe documented instant offense behavior regardless of the conviction offense" on a scale from 0 to 7. *Id.* ch. 4, p.7. Praddy's BP-337 assessed 7 points – the maximum – for the severity of his offense. *See* Ex. to Letter from Mitchell Dinnerstein (Mar. 19, 2012). The assessment was apparently based on the firearms conviction because the form recites, with liberal use of abbreviations, that Praddy "POSS F/A, SHOT/KILLED VCTM." *Id.* Praddy's drug convictions did not qualify for maximum severity because according to a BOP policy statement, an offense involving marijuana warrants 7 points only if, *inter alia*, it involves more than 620 kilograms of the drug. *See* BOP Program Statement P5100.08, app. A, p.1. The BP-337 states (correctly) that Praddy was convicted of "DIST 100KILOS OF MJ," a crime that the BOP considers to be of "moderate severity" and eligible for only 3 points.

As noted, the revised PSR was completed on December 19, 2011. In accordance with the Court's directive, the revision omitted the Simon murder as relevant conduct. It is not clear whether the revised PSR was ever sent to the BOP, but on March 19, 2012, Praddy's counsel wrote to Big Sandy's warden, asking him to "review the classification scoring." The status of that request is also not clear from the record.

## **ANALYSIS**

Praddy challenges his classification and designation in two related ways. First, he argues that the revised PSR remains "filled with erroneous statements unproven to a jury," that the errors should be corrected, and that "the Classification Unit of the Bureau of Prisons [should] be notified of the corrections to be made." Letter from Mitchell

Dinnerstein (Dec. 27, 2011) at 2. Second, he requests that "the Classification Unit be told in the strongest terms that the present classification . . . should be revised and that he should be reclassified from an inappropriate high security United States Penitentiary." *Id.*

**A. Challenges to the PSR**

The PSR is a court document, prepared by court officers at the court's direction. *See United States v. Charmer Indus., Inc.*, 711 F.2d 1164, 1169-70 (2d Cir. 1983). A PSR may eventually be used for other purposes, including security classification by the BOP, but its core function is "to assist the court in determining the appropriate sentence." *Id.* at 1170. Given the importance of the PSR's function, its accuracy is crucial. *See id.* at 1171 ("[C]onfidentiality of the presentence report is not maintained strictly, for considerations of due process require that the court not impose a sentence on the basis of information that is materially false.").

One might assume that a district court has plenary authority to ensure that an important court document is accurate. The reality is more complicated.

Federal Rule of Criminal Procedure 32(d) governs preparation of the PSR. Other subsections lay out the procedure for objecting to the PSR, first with the preparing probation officer, *see* Fed. R. Crim. P. 32(f), and, if unresolved, with the court, *see* Fed. R. Crim. P. 32(g). The means of resolving disputes is left to the court's discretion, *see Charmer Indus.*, 711 F.2d at 1172 (listing alternatives), but the court must "rule on [any] dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). Curiously, Rule 32 does not provide a means for the court to *correct* the PSR;

4

instead, it directs the court to "append a copy of the court's determinations [on objections] to any copy of the presentence report made available to the Bureau of Prisons." Fed. R. Crim. P. 32(i)(3)(C); *see also Charmer Indus.*, 711 F.2d at 1172 ("Whether the decision to disregard disputed statements is made with or without benefit of an evidentiary hearing, the court usually will note its nonreliance but will not cause the inaccurate statements to be deleted from the presentence report.").

Rule 32 provides a means of addressing claims of inaccuracy in a PSR prior to sentencing. In *United States v. Giaimo*, 880 F.2d 1561 (2d Cir. 1989), the Second Circuit squarely held that Rule 32 does not, standing alone, "give a district court jurisdiction to correct inaccuracies in a [PSR] report after a defendant has been sentenced." *Id.* at 1563.

Fortunately (if that is the right word), Praddy's classification was not based on "inaccuracies" in the usual sense. Instead, the record reflects that the BOP relied on a PSR that was later superseded at the Court's direction. Whatever limits there may be on the Court's authority to *correct* a PSR, there can be no objection to its pointing out the confusion and insuring that the BOP has the most up-to-date information available.

To be sure, Praddy argues that, even as revised, the PSR still contains inaccuracies. Some — such as reliance on the testimony of cooperating witnesses Raymond Dowdie and Hayden McQuilken, inclusion of an obstruction-of-justice enhancement and ineligibility for safety valve consideration — were previously endorsed by the Court. That Praddy continues to disagree with the Court's rulings does not render the revised PSR inaccurate.

Other claimed inaccuracies are really just points of possible confusion. As a prophylactic measure, the Court — with the government's consent — makes the following observations:

- Although Praddy was charged with conspiring to distribute and possess with intent to distribute 1000 kilograms or more of marijuana, the drug quantity found by the jury and accepted by the Court for sentencing was 100 kilograms.

- Although the government charged that the Raleigh Place Crew was in existence from 1998 to 2009, it concedes that the evidence supports only that Praddy was affiliated with the crew between 2002 and 2009.

- Praddy was convicted of possessing a firearm in connecting with a drug trafficking offense. At sentencing, the Court found that there was insufficient evidence that that crime involved brandishing or discharging the firearm.

- The government has not alleged that Praddy personally participated in the crimes set forth in paragraphs 12-15 and 17 of the revised PSR. The PSR should not, therefore, be construed as implying that he was.

- The search set forth in paragraph 16 of the revised PSR did not involve Praddy. The PSR should not, therefore, be construed as implying that it did.

- Paragraph 19 of the Revised PSR misleadingly states that Praddy carried a firearm "throughout his involvement in the conspiracy." The remainder of the paragraph correctly sets forth facts relating to a specific instance of gun possession on April 1, 2004.

- Paragraphs 21-38 of the Revised PSR set forth facts relating to others affiliated with the Raleigh Place Crew. They do not purport to set forth facts relating to Praddy, and should not be construed as such.

**B. Challenge to Classification/Designation**

The Court surmises that the BOP strives to make its security classifications as accurately as possible. Nevertheless, it will be helpful to Praddy (and to others who might find themselves in a similar predicament) for the Court to set forth the procedures the BOP has implemented for addressing challenges to an inmate's security classification.

By way of emphasizing the importance of those administrative remedies, the Court will address what judicial remedies, if any, an inmate has.

## 1. Administrative Remedies

The Court's research has not revealed any administrative remedy unique to security classifications. Under the BOP's "Administrative Remedy Program," however, an inmate may "seek formal review of an issue relating to any aspect of his/her own confinement." 28 C.F.R. § 542.10(a). The program lays out different paths depending on the nature of the inmate's complaint: "[F]ormal administrative remedy requests regarding initial decisions that did not originate with the Warden [of the inmate's facility], or his/her staff, may be initially filed with the [BOP] office which made the original decision, and appealed directly to [BOP's] General Counsel." *Id.* § 542.14(d)(5). Since security classifications for new inmates are made by BOP's Classification Unit, Praddy may be proceeding down the wrong path by seeking relief from the warden of his facility. Instead, his attempt at administrative resolution should presumably begin with a request to the Classification Unit and, if necessary, end with an appeal to BOP's General Counsel.

## 2. Judicial Remedies

Courts have long recognized that the classification and designation of inmates is a matter within BOP's sole discretion. *See United States v. Williams*, 65 F.3d 301, 307 (2d Cir. 1995) ("A sentencing court has no authority to order that a convicted defendant be confined in a particular facility, much less placed in a particular treatment program; those decisions are within the sole discretion of the Bureau of Prisons."); *Pugliese v. Nelson*, 617 F.2d 916, 925 (2d Cir. 1980) ("[J]udicial intervention into the classification of prisoners

for monitoring and control purposes would almost inevitably involve the federal courts in the day-to-day operations of our prison system, which are better left to the expertise of prison administration authorities."). That recognition reflects the reality the judicial review of a classification decision is, if not completely unavailable, severely curtailed.

The Administrative Procedures Act does not afford a judicial remedy because prison designations are, by statute, exempted from the Act. *See* 18 U.S.C. § 3625. A district court does, of course, have habeas jurisdiction to address the execution of a sentence under 28 U.S.C. § 2241. *See Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001) ("A motion pursuant to § 2241 generally challenges the execution of a federal prisoner's sentence, including such matters as the administration of parole, computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, type of detention and prison conditions." (citing *Chambers v. United States*, 106 F.3d 472, 474-75 (2d Cir. 1997)). But under the rule announced in *Rumsfeld v. Padilla*, 543 U.S. 426 (2004), a federal prisoner seeking to challenge his custody must "name his warden as respondent and file the petition in the district of confinement." *Id*. at 447. Since Praddy is confined in the Eastern District of Kentucky, this Court does not have jurisdiction over a habeas petition challenging his classification.[1]

---

[1]Filing in the proper court by no means guarantees that a § 2241 petition challenging Praddy's classification would be successful. Prisoners confined pursuant to a judgment of conviction and sentence must show that their confinement violates the Constitution or a federal statute. *See* 28 U.S.C. § 2241(c)(3). In *Moody v. Daggett*, 429 U.S. 78 (1976), the Supreme Court noted that because "Congress has given federal prison officials full discretion to control these conditions of confinement [i.e., prisoner classification and eligibility for rehabilitative programs]," a federal prisoner challenging his classification "has no legitimate statutory or constitutional entitlement sufficient to invoke due process." *Id*. at 88 n.9.

## CONCLUSION

The maxim that "every wrong must have a remedy" is one of the cornerstones of Anglo-American jurisprudence. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) (citing William Blackstone, 3 Commentaries 23, for the proposition that "it is a general and indisputable rule that where there is a legal right, there is also a legal remedy by suit or action at law whenever that right is invaded"). Although the remedy in this case lies principally with the BOP, the Court can at least see to it that the BOP is made aware of the revised PSR.

Therefore, pursuant to Federal Rule of Criminal Procedure 32(i)(3)(C), the Probation Department is directed to append this memorandum to Praddy's revised PSR. It is further directed to serve a copy of the revised PSR, with this memorandum appended, on BOP's Classification Unit and on its General Counsel. The Court recommends, in the strongest terms its limited role allows, that the BOP reconsider Praddy's security classification in light of the revised PSR and this memorandum.

s/ Judge Frederic Block

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
June 25, 2012